IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TAVEREN TORRENCE ROBINSON,** )<br>Petitioner, )<br>)<br>v. )<br>)<br>**LOUIS FOLINO, et al.,** )<br>Respondents. ) | Civil Action No. 07-95 Erie<br><br>District Judge McLaughlin<br>Chief Magistrate Judge Baxter |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

### II.  REPORT

Petitioner, Taveren Torrence Robinson, is a state prisoner currently incarcerated at the State Correctional Institution Greene, located in Waynesburg, Pennsylvania. A jury empaneled by the Court of Common Pleas of Erie County found him guilty of second-degree murder in the stabbing death of Kimberly Simmons. It also convicted him of the attempted rape of Simmons; of the aggravated assault of Simmons and of her cousin, Tyrone Glover; and, of possession of an instrument of crime. The Honorable John A. Bozza presided over Robinson's trial and sentenced him to a term of life imprisonment on the second-degree murder conviction, to be followed by a consecutive term of 60 to 120 months imprisonment on the aggravated assault convictions. Currently pending before this Court is Robinson's Petition for Writ of Habeas Corpus (Docket No. 5), filed pursuant to 28 U.S.C. § 2254, in which he contends that his convictions were obtained in violation of his federal constitutional rights.

#### A.  Relevant Procedural History

In the early morning hours of June 8, 2003, Simmons and Glover were stabbed in her apartment, which is located on the second floor of a building on East 23rd Street in Erie, Pennsylvania. Simmons died as a result of her injuries. Robinson, who knew both Simmons and

Glover, was at the apartment at the time of the incident. Both Simmons and Glover identified Robinson as the perpetrator. He was taken into police custody at the scene. Robinson was charged with Simmons's murder, her attempted rape, and with related crimes. In a statement that he gave to the police later that morning, he claimed that he was innocent and that an intruder had broken into Simmons's apartment, attacked her, and escaped unnoticed by anyone but him. Robinson maintained his innocence at trial.

Robinson's four-day trial commenced on January 30, 2004. Glover testified that he was sleeping in Simmons's living room on June 8, 2003, and that around 4:00 a.m. he awoke and heard Simmons and Robinson talking. Glover knew Robinson and he recognized his voice. At one point, Glover testified, he heard Robinson walk into Simmons's kitchen. After Robinson returned from the kitchen, Glover stated, he attempted to rape Simmons. She struggled to get away from him and called out to Glover for help. Glover stated that Simmons yelled: "Ty, wake up, Taveren trying to rape me." (1/30/04 Trial Tr. at 85-86). He further testified that he wrestled Robinson away from Simmons, and that during their altercation Robinson stabbed him three times in the hand with a steak knife. Glover grabbed the telephone, locked himself in the bathroom, and called 911. Robinson and Simmons continued to struggle, and Robinson stabbed her eight times. Robinson eventually broke down the door to the bathroom, and told Glover that Simmons needed help.

Tonya and Marvin Allen[1] lived in the first-floor apartment, and when they heard the screaming in Simmons's apartment, they hurried upstairs and found Simmons bleeding profusely and Robinson standing over her. Tonya Allen testified that she asked Simmons who stabbed her and that Simmons responded: "You're looking at him" and "Taveren did this to me." (2/2/04 Trial Tr. at 9). Glover testified that Robinson stated that he was innocent and that an intruder "came and did it." (1/30/04 Trial Tr. at 95). Glover then "told Tonya [that Robinson was] lying because he stabbed me in the hand and he stabbed Kim." (Id.)

---

[1] Tonya Allen was Kimberly Simmons's cousin, and at the time of the incident she was unmarried and her last name was also Simmons. By the time of trial, Tonya had married Marvin Allen. In the state court record, Tonya is sometimes referred to by her maiden name. This Court shall refer to Tonya by using her married name.

2

Officer Royce Smith of the Erie County Police was one of the first officers to arrive at the scene in response to Glover's 911 call. He testified that he entered the apartment with his gun drawn and saw Simmons "entirely covered in blood" and lying "limp[ly]" on her side with Tonya Allen kneeling beside her. (2/2/04 Trial Tr. at 31-32). Officer Smith stated that he asked "who did this?" and that Simmons "kind of propped herself up," raised her right arm and pointed at Robinson and said: "Taveren did it." (Id. at 31). Officer Smith asked who Taveren was, and Simmons stated: "The one with the white shirt on." (Id. at 31-32). His testimony was corroborated by Officer David Walker, who also heard Simmons's statements. (Id. at 42). Simmons died four hours later at Hamot Medical Center as a result of multiple stab wounds that she received to her head and neck.

Michael McDonald, who lived across the street from Simmons, testified that he had arrived home around 4:00 a.m. on June 8, 2003, and that as he was getting ready to go to bed, he heard screaming from Simmons's apartment. He ran out to his front porch and saw two figures in Simmons's doorway. McDonald testified that he observed one of the figures striking the other, that he quickly ran inside to alert his mother, and that a few seconds later he returned to his porch to continue to observe the scene. He said he never saw anyone exit Simmons's apartment. (Id. at 107-12).

Bruce Tackett, the forensic scientist supervisor at the State Police Crime Laboratory located in Lawrence Park, testified regarding various bloodstains collected from Simmons's apartment. He explained that there was a "blood trail" extending from the bottom of the stairs to the kitchen, but that no blood was found outside the apartment. (Id. at 178, 198). He further testified that there was a red Negroid hair contained within one of the bloodstains that was consistent with Simmons's own hair, but too short to do microscopic comparison. (2/3/04 Trial Tr. at 22). Although Robinson's blood was not detected in any of the bloodstains that were tested, Tackett explained that it would be impossible to test all the stains present at the scene. (Id. at 26). He further testified that, based on the cuts found on Robinson's hand, there was a good possibility that his blood was present. Yet, due to the sheer amount of blood left by Simmons, it would be extremely difficult to pick out. (Id. at 29).

3

Mary Hokensmith, who was employed by the State Police DNA lab, testified that blood found on Robinson's jeans, on the two knife blades found at the scene, and on Robinson's left hand, matched the DNA of Simmons. (Id. at 42-43). Additionally, Corporal William Wagner, with the State Police Bureau of Forensic Services, provided expert testimony regarding prints lifted from the crime scene. He explained that of the fifteen prints submitted to him, fourteen were unreadable. (Id. at 58). Corporal Wagner testified that the only print that had enough detail to analyze was a palm print lifted from the wooden surface of the left-hand side of the doorjamb located in the area of the archway leading into Simmons's kitchen. He stated that that print did not match Simmons or Robinson. (Id. at 58-60; see also 2/2/04 Trial Tr. at 142-43). Erie Police Detective Patrick Chandley testified that due to the texturing of the two plastic Faberware steak knife handles recovered from the scene,[2] he was unable to lift any prints from them. (2/2/04 at 143-45).

Robinson chose not to testify, and his court-appointed counsel, Daniel J. Brabender, Jr., Esquire, decided not to call any other witnesses for the defense. Brabender attempted to create reasonable doubt in the minds of the jurors through the cross-examination of the Commonwealth's witnesses. He argued to that jury that it was possible that, as Robinson had told the police, someone else had entered Simmons's apartment, stabbed her, and left. Brabender attempted to focus suspicion on Kory Henderson, who is the father of Simmons's youngest child. Henderson had a history of abuse against women, and Simmons had previously received two Protection From Abuse Orders against him. In response to this defense, the Commonwealth introduced evidence to show that Henderson was housed in an Erie County work-release center on June 7 and June 8, 2003, and that the log books from that center indicated that he was there during the relevant time period. (See 2/3/04 Trial Tr. at 80-85). Brabender also argued that the testimonies from the witnesses who were at the scene were not credible because their recollections were tainted by the trauma of the incident. He asserted that Robinson, who had

---

[2] When the police found the two steak knives at the scene, the blades were separated from the handles. Therefore, the blades and the handles of each knife were admitted into evidence as separate items.

4

been cut on his hands during the incident, had been stabbed when he was trying to defend himself and Simmons against an intruder. Brabender emphasized that Robinson had no history of criminal behavior and had no motive to commit the crimes. He argued that the police did a poor job investigating the case, and that they improperly focused their suspicion on Robinson from the beginning and failed to consider whether another person, particularly Henderson, may have committed the crimes. Brabender also pointed out that the Commonwealth failed to produce any scientific evidence linking Robinson to the crimes because no readable prints were lifted from knives recovered from the scene, and no semen, hair, or fingernail scrapings implicated him.

On February 4, 2004, the jury convicted Robinson of second-degree murder in the killing of Simmons, of her attempted rape, of aggravated assault against Simmons and Glover, and of possession of instruments of a crime. After Judge Bozza sentenced Robinson, Brabender withdrew from the case and Tina M. Fryling, Esquire, was appointed to represent him.

On May 6, 2004, Robinson, through Fryling, filed a statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). (State Court Record "SCR" No. 35). He raised one claim that is relevant to this proceeding: that his convictions were against the weight of the evidence. On July 9, 2004, Judge Bozza issued his Rule 1925(b) Opinion explaining why Robinson's judgment of sentence should be affirmed. (SCR No. 41, Commonwealth v. Robinson, No. 1762A & B of 2003, slip op. (C.P. Erie, July 9, 2004)).

The Superior Court issued a Memorandum affirming Robinson's judgment of sentence on April 13, 2005. (SCR No. 44, Commonwealth v. Robinson, No. 688 WDA 2004, slip op. (Pa.Super. Apr. 13, 2005)). It rejected on the merits Robinson's claim that the convictions were against the weight of the evidence. (Id. at 5-7). On October 25, 2005, the Pennsylvania Supreme Court denied Robinson's petition for allowance of appeal.

On November 21, 2005, Robinson filed a *pro se* petition for collateral relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA.CONS.STAT. § 9541 *et seq*. (SCR No. 49). In that petition, he raised numerous claims of ineffective assistance of counsel. Judge Bozza appointed William J. Hathaway, Esquire, to represent Robinson. On January 20, 2006, Hathaway filed a motion for leave to withdraw, accompanied by a "no-merit" letter in which he

5

explained that he had reviewed the *pro se* PCRA petition, the case record, and the applicable law, and that he concluded that in his professional opinion that Robinson failed to state a colorable claim for PCRA relief. (SCR No. 55). Judge Bozza issued a notice of intent to dismiss without a hearing (id.), and Robinson submitted objections (SCR No. 54).

On September 15, 2006, Judge Bozza issued an Opinion denying PCRA relief. (SCR No. 58, Commonwealth v. Robinson, No. 1762A & B of 2003, slip op. (C.P. Erie, Sept. 15, 2006)). Robinson filed a *pro se* appeal to the Superior Court. (SCR No. 60). On April 17, 2007, the Superior Court affirmed, ruling that Robinson's claims of ineffective assistance were without merit. (SCR No. 64, Commonwealth v. Robinson, No. 1848 WDA 2006, slip op. (Pa.Super. Apr. 17, 2007)).

Next, Robinson filed his petition for writ of habeas corpus with this Court. (Docket No. 5). His claims are more fully set forth in his Brief in Reply to Respondents' Answer ("Brief") (Docket No. 13). Robinson alleges:

(A) The evidence was insufficient to support the verdicts; and

(B) He received ineffective assistance of counsel based on the following:

(1) "failure to raise state's destruction of physical evidence collected from hospital, clothing, fingernail scraping, knife handles, origin of identifiable fingerprints, etc.";

(2) "failure to raise state's knowing use of false testimony regarding witnesses testifying to dying declaration, in that such was medically impossible, and disputed by two other witnesses";

(3) "failure to conduct independent investigation in identifiable fingerprints from scene taken from wooden surface, and argue its relevance on proper grounds to the jury";

(4) "failure to raise state's knowing use of false testimony regarding inability to determine age of fingerprints"; and

(5) "failure to request independent DNA analysis of crime scene evidence, blood stain, fingernail, fingerprint expert, etc."

(Docket No. 13 at 2).

**B.     Discussion**

**(1)     Claim A Is Procedurally Defaulted**

A state prisoner must provide the state courts with the first opportunity to consider any

6

claim that he has raised in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A). This "exhaustion" requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights.'" Cristin v. Brennan, 281 F.3d 404, 410 (3d Cir. 2002); see also O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999).

In Claim A, Robinson contends that the evidence at trial was insufficient to sustain the jury's verdicts of guilt. This contention presents a claim that his constitutional guarantee of due process under the Fourteenth Amendment was violated. See Jackson v. Virginia, 443 U.S. 307, 320-21 (1979) (the due process standard recognized in In re Windship, 397 U.S. 358 (1970) protects an accused against conviction except upon evidence that is sufficient to support a conclusion that every element of the crime has been established beyond a reasonable doubt). In a habeas corpus proceeding:

> the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction .... does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.
> ...Instead, *the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*

Jackson v. Byrd, 105 F.3d 145, 147 (3d Cir. 1997) (emphasis added) (quoting Jackson, 443 U.S. at 318-19).

Robinson did not raise a sufficiency of the evidence federal due process claim to the state court. Rather, on direct review he claimed that the verdicts were against the weight of the evidence. A claim that a verdict is against the weight of the evidence is a state law claim that is distinct from a federal due process claim, and it is not a claim that is cognizable in federal habeas corpus. Tibbs v. Florida, 457 U.S. 31, 37-45 (1982) (weight of evidence claims raise questions of credibility; it is different from a claim that the evidence was insufficient to support the conviction); see also Young v. Kemp, 760 F.2d 1097, 1105 (11th Cir. 1985). In fact, by making a challenge to the weight of the evidence on direct appeal, Robinson *conceded that sufficient evidence exists to sustain the verdict*s, but questioned whether the evidence produced against him should have been believed. See, e.g., Commonwealth v. Charlton, 902 A.2d 554, 561 (Pa.Super.

7

2006) (A challenge to the weight of the evidence concedes that sufficient evidence exists to sustain the verdict).

Because Robinson did not raise a federal due process claim to the state courts, he failed to exhaust Claim A. Landano v. Rafferty, 897 F.2d 661, 668 (3d Cir. 1990) (the claim raised in a federal habeas petition must be the "substantial equivalent" to that presented to the state courts.); Duncan v. Henry, 513 U.S. 364, 366 (1995) ("Mere similarity" of claims presented to the state and federal courts is "insufficient to exhaust."). As a result, Claim A is procedurally defaulted. See, e.g., Whitney v. Horn, 280 F.3d 240, 251-52 (3d Cir. 2002) (when a petitioner has failed to exhaust a claim in state court, the procedural default doctrine applies to bar federal habeas relief); Lines v. Larkins, 208 F.3d 153, 160-65 (3d Cir. 2000). A federal court may only reach the merits of a procedurally defaulted claim if the petitioner makes a showing of "cause and prejudice" or establishes a "fundamental miscarriage of justice" in order to overcome the procedural default. See, e.g., Murray v. Carrier, 477 U.S. 478, 485, 495 (1986); Whitney, 280 F.3d at 252-53; Lines, 208 F.3d at 165-67. Robinson does not argue that he satisfies either requirement with respect to Claim A.

However, even if Robinson could overcome his default and this Court could consider Claim A on the merits, it would still be denied. There can be no doubt that that, in viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crimes for which he was convicted beyond a reasonable doubt.

**(2) Robinson's Ineffective Assistance Of Counsel Claims Do Not Entitle Him To Habeas Relief**

**(a) Standard of Review**

Because the state court adjudicated Robinson's ineffective assistance of counsel claims on the merits, this Court's review of those claims is governed by AEDPA's deferential standard of review, which is set forth at 28 U.S.C. § 2254(d). AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). It provides, in relevant part:

8

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

28 U.S.C. § 2254(d)(1). See also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lambert, 387 F.3d at 234.

The "clearly established Federal law" in which to analyze a petitioner's ineffective assistance claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Id. at 688; see also Williams, 529 U.S. at 390-91. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 689). "However, [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (quoting Strickland, 466 U.S. at 689). "[I]t is only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997).

Strickland also requires that a petitioner show that he was prejudiced by his counsel's deficient performance. "This requires showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. In other words, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

9

Because AEDPA's standard of review applies here, the only question before this Court is whether the state court's adjudication of any of Robinson's ineffective assistance of counsel claims was an "unreasonable application of" Strickland under 28 U.S.C. § 2254(d)(1).[3] In conducting this inquiry, this Court is "not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices." Werts, 228 F.3d at 197. It is not enough for Robinson to show that the state court's decision was an "incorrect or erroneous" application of Strickland. Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citations omitted). Instead, he must show that its application of Strickland was "objectively unreasonable" meaning, the "outcome...cannot reasonably be justified under existing Supreme Court precedent." Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004) (citations omitted).

### b. Destruction of Evidence – Claim B(1)

Robinson contends that his counsel was ineffective for not arguing that the prosecution infringed upon his due process rights for failing to preserve potentially useful evidence. The Supreme Court's decisions in California v. Trombetta, 467 U.S. 479 (1984) and Arizona v. Youngblood, 488 U.S. 51 (1988) establish standards for determining whether the government has infringed on a defendant's due process rights by failing to preserve evidence. See Lambert, 387 F.3d at 267. Of relevance here is the requirement of bad faith on the part of the government. In Youngblood, the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58.

Judge Bozza found as fact that "the only evidence not properly preserved was

---

[3] The Superior Court applied the correct legal standard to the ineffective assistance claims that Robinson raised in the PCRA proceeding. (SCR No. 64, Robinson, No. 1848 WDA 2006, slip op. at 7, 11 (citing Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987) (Pennsylvania test for evaluating claims of ineffective assistance is the same as the Strickland standard)); see also Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999) (legal standard for evaluating ineffective assistance claims in a PCRA proceeding is the same as the Strickland standard). Therefore, the state court's adjudication of these claims was not "contrary to" Strickland under 28 U.S.C. § 2254(d)(1). See Werts v. Vaughn, 228 F.3d 178, 202-04 (2000) ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted Strickland and thus was not 'contrary to' established Supreme Court precedent.").

10

[Simmons's] clothing." (SCR No. 58, Robinson, 1762 A & B of 2003, slip op. at 8). He explained that "the record indicates that fingernail clippings were taken from the decedent at the time rape kits [were] done, and that the clippings were in fact preserved for testing. Mr. Tackett testified at trial that he tested the clippings and found human blood to be present, however he stated that there was not enough blood present to identify whose blood it was." (Id. at 7-8 (citing 2/2/04 Trial Tr. at 166-167; 2/3/04 Trial Tr. at 3)). Judge Bozza's factual finding may not be disturbed by this Court. He made a reasonable determination of the facts in light of the evidence presented in the State court proceeding, 28 U.S.C. § 2254(d)(2), and his finding is also entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).[4]

With regard to Simmons's destroyed clothing, at trial the prosecution and the defense agreed to the following stipulation: "On June 8, 2003, the victim, Kimberly Simmons, was brought to Hamot Hospital for treatment. During that treatment her clothing was removed. *John Abbate, an employee of Hamot Hospital, disposed of that clothing unaware that it was to be kept for investigative purposes*." (2/2/04 Trial Tr. at 106 (emphasis added)). During the PCRA proceeding, Judge Bozza correctly observed that the Supreme Court's decision in Youngblood requires a showing of bad faith on the part of the government. (Id. at 8). He then determined:

> In the case at hand, *there is no credible basis to assert bad faith on the part of the Commonwealth in regard to the preservation of the decedent's clothing*. According to the medical records supplied to the Court by Hamot Medical Center Emergency Department, the decedent's shirt and bra were cut off and disposed by hospital personnel upon her arrival at the emergency room. It was not an agent of the Commonwealth that undertook the disposal of the clothing; therefore there was no bad faith on their part. *In addition, it is entirely speculative that such evidence would have served as exculpatory evidence.* Therefore, due to the speculative nature of the exculpatory benefit of the clothing and in light of the evidence and testimony presented at trial, failure of the trial counsel to pursue such a due process violation was not prejudicial to the defendant. This claim is without arguable merit.

---

[4] A federal habeas court must give considerable deference to state court factual determinations. Lambert, 387 F.3d at 239. Under AEDPA, a petitioner must establish that the state court's adjudication of his claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). Within this overarching standard, a petitioner may attack specific factual determinations that are subsidiary to the ultimate decision. Id. § 2254(e)(1); Lambert, 387 F.3d at 235. Section 2254(e)(1) instructs that "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

(Id. at 8 (emphasis added)). In reviewing this claim on appeal, the Superior Court reiterated that, even if Robinson had shown bad faith on the part of the Commonwealth (which he did not), this claim would still fail because he had not shown that there is a reasonable probability that the outcome of his trial would have been different had counsel raised a due process violation. (SCR No. 64, Robinson, No. 1848 WDA 2006, slip op. at 13).

The state courts' adjudication of this claim was not an "unreasonable application of" Strickland under 28 U.S.C. § 2254(d)(1). Brabender did not dispute that an employee of the hospital had disposed of Simmons's clothing and that the police had no involvement in the clothing's destruction. There is no evidence to support Robinson's contention that Brabender should have claimed that the police acted in bad faith and that Robinson's due process rights had been violated.

In an effort to avoid this conclusion, Robinson claims that Judge Bozza erred in dismissing his PCRA petition without an evidentiary hearing and that as a result of that error he was prevented from developing evidence to support his contention that exculpatory evidence was destroyed. (Brief, Docket No. 13 at 20). Whether Judge Bozza properly exercised his discretion in denying Robinson an evidentiary hearing is not a cognizable claim in federal habeas corpus:

> The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States. 28 U.S.C. §§ 2254, 2255. Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; *what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation.*

Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir.1998) (internal citations omitted) (emphasis added); see also Lambert, 387 F.3d at 247 ("[A]lleged errors in collateral proceedings are not a proper basis for habeas relief from the original conviction.").

### (c) Failure to Investigate – Claims (B)(3) & (5)

Robinson contends that Brabender was ineffective for failing to conduct a constitutionally sufficient investigation to support his defense that another person killed Simmons. According to him, Brabender should have retained defense experts to evaluate the palm print found on the wooden doorjamb and to conduct DNA testing on the other physical evidence.

12

The Superior Court denied these claims because Robinson failed to show prejudice in light of the overwhelming evidence of his guilt. (SCR No. 64, Robinson, No. 1848 WDA 2006, slip op. at 14-16). That determination was not an unreasonable application of Strickland under 28 U.S.C. § 2254(d)(1). The United States Court of Appeals for the Third Circuit has noted that "[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied." Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999) (citing Strickland, 466 U.S. at 695). This is so because "[a] court simply cannot" "determine whether there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different[,]" "without considering the strength of the evidence against the accused." Id.

The Superior Court also reasonably held that Robinson had failed to show that a defense expert would have testified any differently, or more favorably for the defense, than the prosecution's experts. The prosecution did not present any physical evidence definitively linking Robinson to the crimes. The only readable print was lifted from the wooden doorjamb and the prosecution's own expert witness admitted that that print could not be attributed to Robinson or Simmons. The prosecution also introduced into evidence a carpet section with a bloody footprint on it, but it was unable to present expert testimony linking that print to Robinson. And, the prosecution could not lift any readable prints from the two Faberware black plastic knife handles recovered from the scene, and therefore could not provide expert testimony linking Robinson to the murder weapon. Brabender seized upon the shortcomings in the prosecution's expert evidence, and emphasized repeatedly to the jury that their testimony left open the possibility that another person had committed the crimes. However, this was not the type of case where scientific evidence assumed overwhelming importance. It was undisputed that Robinson was at Simmons's apartment when she was attacked. Glover knew Robinson and identified him as being the man who attacked Simmons and who stabbed him three times when he was trying to defend Simmons. Simmons's dying declarations were also extraordinarily damning to Robinson. His baseless speculation that further DNA or print analysis would have undercut the strong evidence of his guilt do not warrant habeas relief.

### (d) Knowing Use of False Testimony – Claims B(2) & (4)

Robinson claims that his counsel was ineffective for failing to object to the prosecution's presentation of false testimony in violation of Napue v. Illinois, 360 U.S. 264 (1959) and Giglio v. United States, 405 U.S. 150 (1972). (Brief, Docket No. 13 at 21). In those cases, the Supreme Court "held that the state's knowing use of perjured testimony to obtain a conviction violates the Fourteenth Amendment." Lambert, 387 F.3d at 242 (citing Giglio, 405 U.S. at 153; Napue, 360 U.S. at 269; additional citations omitted). It is "fundamentally unfair to the accused where 'the prosecution's case includes perjured testimony and [ ] the prosecution knew, or should have known, of the perjury.'" Id. (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)).

Robinson contends that Simmons's dying declaration that "Taveren did this to me" was false because it was medically impossible for Simmons to have spoken and because neither Glover nor Marvin Allen heard the statement. (Brief, Docket No. 13 at 21). As the Superior Court concluded, "[t]his claim is utterly without merit." (SCR No. 64, Robinson, No. 1848 WDA 2006, slip op. at 12). There is no evidence to support a contention that the Commonwealth knowingly presented false testimony. Robinson's claim that Simmons was too incapacitated by her injuries to speak when Tonya Allen and the police first arrived at the scene is directly refuted by the evidence admitted at trial. A transcription of the recorded 911 call is not included in the record submitted to this Court, but the recording apparently captured Simmons speaking. (See 2/4/2004 Trial Tr. at 27). Moreover, Dr. Eric Vey, who performed the autopsy of Simmons, testified that she would have been capable of talking for between five to ten minutes after she was stabbed. (2/3/04 Trial Tr. at 110). The evidence at trial supported a finding that Tonya Allen and the police would have been on the scene within that time frame and that Simmons would have still been capable of talking when they came upon her.

Moreover, that Glover and Marvin Allen did not overhear Simmons's dying declaration does not support an argument that the prosecution knowingly presented false evidence. Tonya Allen, Officer Smith, and Officer Walker said that Simmons made the statement, and Robinson's contention that they were lying and that the prosecution knew that they were lying is baseless.

Under the circumstances, Brabender handled the situation in an objectively reasonable

manner. Prior to trial, he filed a motion in limine (SCR No. 15) in which he sought a ruling from Judge Bozza barring the admission of Simmons's declarations on hearsay grounds. After conducting oral argument, Judge Bozza denied the motion. (SCR No. 19). He concluded that Simmons's statement that "Taveren did this to me" was a dying declaration and therefore was admissible under an exception to the hearsay rule. (See Robinson, No. 1762 A & B of 2003, slip op. at 8-11). Once Judge Bozza permitted Simmons's statement to be admitted, Brabender pursued the only option available to the defense – he argued to the jurors that they should not credit Allen's and the officers' testimonies. He emphasized that Glover and Allen did not also overhear Simmons's dying declaration. Brabender also pointed out that during the course of the 911 recording, Simmons's voice can be heard and she did not reference Robinson. Thus, Brabender pursued means of impeaching the credibility of the dying declaration by trying to raise reasonable doubt in the minds of the jurors that the statement was made. The jury likely was not persuaded by Brabender's arguments, but that was not the result of ineffective assistance on his part.

Robinson also argues that the Commonwealth knowingly presented false testimony during the direct examination of Corporal Wagner. (Brief, Docket No. 13 at 29). Corporal Wagner testified that the palm print processed from the wooden doorjamb did not match either Robinson or Simmons. He added that "[t]here is no scientific basis to age a latent print." (2/2/04 Trial Tr. at 61, 67). Robinson argues that the age of a latent print can be estimated and that the prosecution suborned perjury. He did not present any evidence to support this contention during the PCRA proceeding, and for that reason alone the Superior Court's rejection of this claim (SCR No. 64, Robinson, No. 1848 WDA 2006, slip op. at 16-17) withstands AEDPA's standard of review under 28 U.S.C. § 2254(d). Further, in light of the overwhelming evidence of Robinson's guilt – most notably Simmons's declarations identifying him as her attacker and Glover's identification testimony – the Superior Court's conclusion that Robinson failed to show that he was prejudiced also was not an unreasonable application of Strickland under 28 U.S.C. § 2254, and therefore relief on this claim is denied.

15

### C. Certificate of Appealability

Section 102 of the Antiterrorism and Effective Death Penalty Act (28 U.S.C. § 2253 (as amended)) codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. Amended Section 2253 provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." In Slack v. McDaniel, 529 U.S. 473, 474 (2000), the Supreme Court also stated that "[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Applying those standards here, jurists of reason would not find it debatable whether Robinson's ineffective assistance of counsel claims are without merit, or that his claim of insufficient evidence is procedurally defaulted. Accordingly, a certificate of appealability should be denied.

## III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied, and that a certificate of appealability be denied.

In accordance with 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4(B), the parties are allowed 10 days from the date of service to file written objections to this Report and Recommendation. Any party opposing the objections shall have 7 days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights. See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

Dated: March 26, 2009

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
CHIEF UNITED STATES MAGISTRATE JUDGE